NORTHERN LUMBER CO. v. O'BRIEN et al.

(Circuit Court of Appeals, Eighth Circuit. July 26, 1905.)

No. 2,219.

1. PUBLIC LAND—SETTLED MEANING OF TERM IN LEGISLATION OF CONGRESS.

The words "public land" have long had a settled meaning in the legislation of Congress, and, when a different intention is not clearly expressed, are used to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made.

2. SAME—WITHDRAWAL FOR BENEFIT OF RAILROAD LAND GRANT.

Where a withdrawal of public lands along the route of a railroad, in aid of which a grant of lands has been made by Congress, is made by the chief officers of the Land Department in advance of the definite location of the route of such road, in order that the lands may be preserved for the ultimate satisfaction of the grant, such withdrawal, if not made in opposition to the terms of the grant or other congressional enactment, is a reservation made by competent authority. The reservation, during its continuance, removes the lands embraced therein from the category of public land, and excludes them from subsequent railroad land grants containing no clear declaration of an intention to include them, even though it subsequently transpires that the withdrawal was ill-advised, or that the lands are not required for the satisfaction of the prior grant.

3. SAME—GRANT TO NORTHERN PACIFIC RAILROAD COMPANY.

The grant to the Northern Pacific Railroad Company made by the act of July 2, 1864, c. 217, 13 Stat. 365, was one in præsenti, and was in terms confined to public land. Land not public at the date of the grant

was not granted, even though it subsequently became of that character. Bardon v. Northern Pacific Railroad Co., 12 Sup. Ct. 856, 145 U. S. 535, 36 L. Ed. 806, followed; United States v. Oregon & California Railroad Co., 20 Sup. Ct. 261, 176 U. S. 28, 44 L. Ed. 358, distinguished.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Minnesota.

For opinion below, see 134 Fed. 303.

This is a suit in equity, brought by the appellant to obtain a decree perpetually enjoining the appellees from cutting or removing the timber standing on part of an odd-numbered section of land in Northern Minnesota. The land is vacant and unoccupied, and the timber thereon gives it its principal value. The appellant claims full title, under the grant of public lands made to the Northern Pacific Railroad Company by Act Cong. July 2, 1864, c. 217, 13 Stat. 365. When the suit was brought the appellees were asserting a right to cut and remove the timber, under a claim to the land initiated under the forest reserve lieu land provision in Act Cong. June 4, 1897, c. 2, 30·Stat. 11, 36 [U. S. Comp. St. 1901, p. 1541]. The claim under the grant to the railroad company had been presented to and rejected by the Land Department of the government prior to the initiation of the claim under the act of June 4, 1897. 31 Land Decisions, 32. The latter claim was initiated prior to the bringing of the suit, and, as shown by the supplemental bill and the answer thereto, was perfected into full title by the issuance of a patent thereon during the pendency of the suit. At the date of the grant to the Northern Pacific Railroad Company the land was withdrawn from pre-emption, settlement, and sale in order that it might be ultimately available for the satisfaction of a prior grant of lands made by Congress May 5, 1864 (13 Stat. 64, c. 79), in aid of the construction of a railroad from St. Paul, Minn., to the head of Lake Superior, which came to be known as the Lake Superior & Mississippi Railroad. This withdrawal was made by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, May 26, 1864, after the filing and acceptance of a map of the general route of the Lake Superior & Mississippi Railroad, which indicated that the land would fall within the place limits of the grant made in aid of that road. The land was public in the full sense of the term at the date of the grant of May 5, 1864, and at the date of the withdrawal. The route of the Lake Superior & Mississippi road as definitely located September 25, 1866, by the filing and acceptance of the required plat, departed so far from the line provisionally indicated upon the map of the general route that this land fell entirely without the limits of the grant. The prior withdrawal was then impliedly, if not expressly, revoked as to all lands falling without the limits of the grant as adjusted to the line of definite location. It was during the existence of the withdrawal for the benefit of the Lake Superior & Mississippi Railroad that the grant of public land was made to the Northern Pacific Railroad Company by the act of July 2, 1864, supra. This land is within the place limits of that grant, and the portion of that company's railroad opposite thereto was definitely located July 6, 1882. At that time this land was public land, not mineral, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights. The Circuit Court held that land which at the date of the grant to the Northern Pacific Railroad Company was included within a withdrawal like that made for the benefit of the Lake Superior & Mississippi Railroad did not come within the description of "public land" granted to the Northern Pacific Railroad Company, and entered a decree dismissing the bill and supplemental bill. 134 Fed. 303.

The grant to the Northern Pacific Railroad Company is expressed in the third section of the act of July 2, 1864, supra, and reads as follows:

"Sec. 3. And be it further enacted, that there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said

line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preempted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than 10 miles beyond the limits of said alternate sections: provided, that, if said route shall be found upon the line of any other railroad route to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act: provided, further, that the railroad company receiving the previous grant of land may assign their interest to said 'Northern Pacific Railroad Company,' or may consolidate, confederate, and associate with said company upon the terms named in the first section of this act: provided, further, that all mineral lands shall be, and the same are hereby, excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd numbered sections, nearest to the line of said road may be selected as above provided: and provided, further, that the word 'mineral,' when it occurs in this act, shall not be held to include iron or coal: and provided, further, that no money shall be drawn from the treasury of the United States to aid in the construction of the said 'Northern Pacific Railroad.'" 13 Stat. 367.

James B. Kerr, for appellant.
J. N. Searles, for appellees.

Before VAN DEVANTER, Circuit Judge, and CARLAND and POLLOCK, District Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The grant to the Northern Pacific Railroad Company was one in præsenti and was in terms confined to "public land." St. Paul & Pacific R. R. Co. v. Northern Pacific R. R. Co., 139 U. S. 1, 5, 11 Sup. Ct. 389, 35 L. Ed. 77. Land not public at the date of the grant was not granted, even though it subsequently became of that character. Bardon v. Northern Pacific R. R. Co., 145 U. S. 535, 539, 12 Sup. Ct. 856, 36 L. Ed. 806; Northern Pacific Ry. Co. v. De Lacey, 174 U. S. 622, 626, 19 Sup. Ct. 791, 43 L. Ed. 1111; United States v. Southern Pacific R. R. Co., 146 U. S. 570, 594, 606, 13 Sup. Ct. 152, 36 L. Ed. 1091. The words "public land" have long had a settled meaning in the legislation of Congress, and, when a different intention is not clearly expressed, are used to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made. Bardon v. Northern Pacific R. R. Co., supra; Wilcox v. McConnell, 13 Pet. 498, 513, 10 L. Ed. 264; Leavenworth, etc., R. R. v. United States, 92 U. S. 733, 741, 745, 23 L. Ed. 634; Newhall v. Sanger, 92

U. S. 761, 23 L. Ed. 769; Doolan v. Carr, 125 U. S. 618, 630, 8 Sup. Ct. 1228, 31 L. Ed. 844; Cameron v. United States, 148 U. S. 301, 309, 13 Sup. Ct. 595, 37 L. Ed. 459; Mann v. Tacoma Land Co., 153 U. S. 273, 284, 14 Sup. Ct. 820, 38 L. Ed. 714; Barker v. Harvey, 181 U. S. 481, 490, 21 Sup. Ct. 690, 45 L. Ed. 963; Scott v. Carew, 196 U. S. 100, 109, 25 Sup. Ct. 193, 49 L. Ed. 403. From the time of the earliest railroad land grants it was the practice of the chief officers of the Land Department, to whom was committed the administration of such grants, to withdraw from settlement, entry, and sale the public lands along the line or route of the road so aided, in advance of its definite location, in order that the lands might be preserved for the ultimate satisfaction of the grant. Such withdrawals, where not made in opposition to the terms of the grant or other congressional enactment, have been uniformly declared to be reservations made by competent authority and to be efficient to remove the lands therein from the category of public land and to exclude them from subsequent railroad land grants containing no clear declaration of an intention to include them; and this, even though it subsequently transpired that the withdrawal was ill-advised, or that the lands therein were not required for the satisfaction of the grant. Wolcott v. Des Moines Company, 5 Wall. 681, 688, 18 L. Ed. 689; Riley v. Welles, 154 U. S. 578, 14 Sup. Ct. 1166, 19 L. Ed. 648; Wolsey v. Chapman, 101 U. S. 755, 768, 25 L. Ed. 915; Wisconsin Central R. R. Co. v. Forsythe, 159 U. S. 46, 54, 55, 15 Sup. Ct. 1020, 40 L. Ed. 71; Spencer v. McDougal, 159 U. S. 62, 15 Sup. Ct. 1026, 40 L. Ed. 76; Northern Pacific R. R. Co. v. Musser-Sauntry Co., 168 U. S. 604, 607, 18 Sup. Ct. 205, 42 L. Ed. 596.

The application of these fixed rules of decision to the facts of the present case sustains the holding of the Circuit Court and requires that its decree be affirmed. At the date of the grant to the Northern Pacific Railroad Company the land now in controversy was embraced in a subsisting withdrawal made by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, for the purpose of preserving the land for the satisfaction of a prior grant in aid of the construction of another railroad, the provisional location of which, as shown upon the accepted map of its general route, indicated that the land would probably fall within the place limits of that grant, and would be required for its satisfaction. The withdrawal was not made in opposition to the terms of the prior grant or of any other congressional enactment, and there is nothing in the subsequent grant to the Northern Pacific Railroad Company indicative of an intent on the part of Congress to use the words "public land" therein in a sense which would embrace lands at that time withdrawn or reserved for the protection of a prior grant. In short, the subsequent grant, being in præsenti and confined to public land, did not embrace the land now in controversy, because it was then excluded from the category of public land by reason of the subsisting withdrawal or reservation. It is true that, after the date of the grant to the Northern Pacific Railroad Company and before the definite location of the line of that company's road, the land was released from the withdrawal, and

thereupon became public in the fullest sense of the term; but this did not place it within the operation of a preceding grant in præsenti confined to land then public. The release simply restored it to the public domain and subjected it to future disposal under any law then applicable to it. The decision of the Supreme Court in Bardon v. Northern Pacific Railroad Co., supra, is conclusive on this point: The land there in controversy was part of an odd-numbered section, not mineral, within the place limits of the grant to the Northern Pacific Railroad Company made by the act of July 2, 1864 (13 Stat. 365, c. 217), and to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of that company's road was definitely fixed; but it was not "public land," within the usual and settled meaning of that term at the date of the grant. It was then covered by a subsisting pre-emption entry theretofore wrongfully allowed without proof of the pre-emptor's compliance with the law. Shortly thereafter, and before the line of road was definitely fixed, the entry was canceled by the Commissioner of the General Land Office because of the absence of such proof, and the money theretofore paid on the entry was refunded by the government. There, as in the present case, it was contended that the status of the land at the date when the line of road was definitely fixed was the only criterion in determining whether or not it passed to the railroad company under the grant. In holding otherwise the court said (page 538 of 145 U. S., page 857 of 12 Sup. Ct. [36 L. Ed. 806]):

"It is thus seen that when the grant to the Northern Pacific Railroad Company was made, on the 2d of July, 1864, the premises in controversy had been taken up on the pre-emption claim of Robinson, and that the pre-emption entry made was uncanceled; that by such pre-emption entry the land was not at the time a part of the public lands, and that no interest therein passed to that company. The grant is of alternate sections of public land, and by public land, as it has been long settled, is meant such land as is open to sale or other disposition under general laws. All land, to which any claims or rights of others have attached, does not fall within the designation of 'public land.' The statute also says that whenever, prior to the definite location of the route of the road, and of course prior to the grant made, any of the lands which would otherwise fall within it have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands are to be selected in lieu thereof under the direction of the Secretary of the Interior. There would therefore be no question that the pre-emption entry by the heirs of Robinson, the payment of the sums due to the government having been made, as the law allowed, by them after his death, took the land from the operation of the subsequent grant to the Northern Pacific Railroad Company, if the pre-emption entry had not been subsequently canceled. But such cancellation had not been made when the act of Congress granting land to the Northern Pacific Railroad Company was passed. It was made more than a year afterwards. As the land pre-empted then stood on the records of the Land Department, it was severed from the mass of public lands, and the subsequent cancellation of the pre-emption entry did not restore it to the public domain, so as to bring it under the operation of previous legislation, which applied at the time to land then public. The cancellation only brought it within the category of public land in reference to future legislation. This, as we think, has long been the settled doctrine of this court."

And referring to the case of Leavenworth, etc., R. R. Co. v. United States, supra, in which a claim to lands under a railroad land grant was rejected where the lands were within an Indian reservation at the date of the grant, but at the date of the definite location of the line of the road had become public land in the proper sense of the term by reason of the termination of the reservation, it was also said (page 543 of 145 U. S., page 859 of 12 Sup. Ct. [36 L. Ed. 806]):

"Three justices, of whom the writer of this opinion was one, dissented from the majority of the court in the Leavenworth Case; but the decision has been uniformly adhered to since its announcement, and this writer, after a much larger experience in the consideration of public land grants since that time, now readily concedes that the rule of construction adopted, that in the absence of any express provision indicating otherwise a grant of public lands only applies to lands which are at the time free from existing claims, is better and safer, both to the government and to private parties, than the rule which would pass the property subject to the liens and claims of others. The latter construction would open a wide field of litigation between the grantees and third parties."

Upon the filing and acceptance of the map showing the general route of its railroad the Lake Superior & Mississippi Railroad Company acquired an inchoate right to the odd-numbered sections public at the date of the grant of May 5, 1864, within the prescribed limits on each side of that route, and thereupon the land officers, anticipating that the line of definite location would substantially conform to the general route, withdrew these sections from pre-emption, settlement, and sale, thus placing them in a state of reservation for the benefit of that company and removing them from the category of public land. Such was the status of the land now in controversy when the grant was made to the Northern Pacific Railroad Company. Had the line of definite location of the Lake Superior & Mississippi Railroad as subsequently established conformed to the line of its general route sufficiently to have brought the land within the place limits of the grant in aid of that road, there would be no question that the Lake Superior & Mississippi Railroad Company would thereupon have acquired a vested right to the land, as of the date of that grant, and that the same would not be within the operation of the grant to the Northern Pacific Railroad Company. Northern Pacific R. R. Co. v. Musser-Sauntry Co., 168 U. S. 604, 611, 18 Sup. Ct. 205, 42 L. Ed. 596; St. Paul & Pacific R. R. Co. v. Northern Pacific R. R. Co., 139 U. S. 1, 17, 11 Sup. Ct. 389, 35 L. Ed. 77; United States v. Southern Pacific R. R. Co., 146 U. S. 570, 595, 13 Sup. Ct. 152, 36 L. Ed. 1091. As, however, the line of definite location of the Lake Superior & Mississippi Railroad departed materially from the general route, no title to the land vested in the Lake Superior & Mississippi Railroad Company, and the withdrawal or reservation was modified accordingly; but these matters, occurring subsequently to the grant to the Northern Pacific Railroad Company, and therefore after the time in respect of which that grant must operate as one in præsenti, if at all, are without any bearing upon the decision of the present case, unless, as before indicated, there is something in the granting act clearly indicative of

an intent on the part of Congress to depart from the settled meaning of the words "public land" and to use them in a sense which would embrace lands then withdrawn and reserved for the satisfaction of a prior grant in aid of another railroad. Not only is there nothing in the act of July 2, 1864, indicative of such intent, but the clear import of the first proviso to section 3, supra, is that there was none. United States v. Southern Pacific R. R. Co., 146 U. S. 570, 605, 13 Sup. Ct. 152, 36 L. Ed. 1091.

The reliance of counsel for the appellant seems to be on the cases of Northern Pacific R. R. Co. v. Sanders, 166 U. S. 620, 17 Sup. Ct. 671, 41 L. Ed. 1139; Menotti v. Dillon, 167 U. S. 703, 17 Sup. Ct. 945, 42 L. Ed. 333; Nelson v. Northern Pacific Ry. Co., 188 U. S. 108, 23 Sup. Ct. 302, 47 L. Ed. 406; and United States v. Oregon & California R. R. Co., 176 U. S. 28, 20 Sup. Ct. 261, 44 L. Ed. 358. None of these cases has particular reference to or makes the decision turn upon the clause, "there be, and hereby is, granted * * * every alternate section of public land," which makes the grant one in præsenti of land then public, but instead each has particlar reference to and makes the decision turn upon the limitation on the granting clause, which makes it also requisite that "the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption, or other claims or rights at the time the line of said road is definitely fixed." They all recognize the well-established rule, that the grantee under a railroad land grant acquires, by designating the general route of its road, only an inchoate right to the odd-numbered sections granted by Congress, and that until the definite location of the road these sections remain within the disposing power of Congress, and this, even though they be withdrawn for the protection of the grant, as in the present case; but there is nothing in this which is inconsistent with the rule, equally well established, that an intent to supersede such a withdrawal and to make other disposition of the lands covered thereby is not deducible from subsequent legislation relating to "public land," unless it contains something to indicate that that term is used otherwise than according to its settled meaning. This is made clear in Menotti v. Dillon, where it was said (page 719 of 167 U. S., page 950 of 17 Sup. Ct. [42 L. Ed. 333]):

"It is said that the railroad company filed its map of general route on the 8th day of December, 1864, and that, these lands having been withdrawn from pre-emption, private entry, and sale by the executive order of January 30, 1865, they were not embraced by the act of 1866. In our opinion this is not a proper interpretation of that act. The proviso of the first section distinctly indicates certain cases to which the act should not apply; and, distinctly excluding those cases, but no others, from its operation, the act, in express words, confirmed to the state, 'in all cases,' lands which the state had theretofore selected in satisfaction of any grant by Congress and sold to purchasers in good faith under its laws."

In this connection it may be properly observed that the same rule which defeats the appellant in the present case was applied in favor of its grantor, the Northern Pacific Railroad Company, as much as 14 years ago, in St. Paul & Pacific R. R. Co. v. Northern Pacific R. R. Co., 139 U. S. 1, 17, 11 Sup. Ct. 389, 394, 35 L. Ed. 77, where it was said:

"Besides, the withdrawal made by the Secretary of the Interior of lands within the 40-mile limit, on the 13th of August, 1870, preserved the lands for the benefit of the Northern Pacific Railroad from the operation of any subsequent grants to other companies not specifically declared to cover the premises."

The very earnest contention of learned counsel for the appellant that the question presented in this case is identical with that determined by the Supreme Court in United States v. Oregon & California R. R. Co., supra, justifies a somewhat extended statement respecting that case. Primarily the controversy arose out of a claimed conflict between the grant made to the Northern Pacific Railroad Company by the act of July 2, 1864, and the grant to the Oregon & California Railroad Company made by the act of July 25, 1866 (14 Stat. 239, c. 242). March 6, 1865, Josiah Perham, president of the Northern Pacific Railroad Company, addressed to the Secretary of the Interior a communication transmitting to that officer a map said to designate the general route of the Northern Pacific Railroad, and requested that it be filed in the office of the Commissioner of the General Land Office, and that an order of withdrawal be made of the lands along the route designated. The map was not accepted, because not sufficient as a map of general route, and no order of withdrawal was made thereon; nor was there ever any definite location or construction of the Northern Pacific Railroad opposite to the lands in suit. The road of the Oregon & California Railroad Company was definitely located and constructed, and the lands within the area of the claimed conflict were patented to it. Subsequently Act Sept. 29, 1890, c. 1040, 26 Stat. 496 [U. S. Comp. St. 1901, p. 1598], forfeited to the United States all lands theretofore granted to any corporation to aid in the construction of a railroad which were opposite to and coterminous with the portion of such railroad not then completed and in operation. The purpose of the suit was to cancel the patents issued to the Oregon & California Railroad Company for the lands within the area claimed to be in conflict; the contention of the government being that the patents were issued without authority of law. It was stated in the opinion:

"This contention rests upon the assumption that the lands so patented, although within the limits of the grant contained in the act of July 25, 1866, and within the line of the Oregon Company as definitely located, were excluded from that grant because included in the grant previously made to the Northern Pacific Railroad Company by the act of July 2, 1864, * * * in which case it is insisted that they were forfeited to the United States by the act of September 29, 1890, * * * and should be so adjudged."

The opinion does not disclose any contention on the part of the government that the grant of July 25, 1866, being one in præsenti and confined to public land, did not include the lands in controversy, because then withdrawn or reserved for the benefit of the prior grant. To the contrary it is said:

"The contention of the government renders it necessary to ascertain what interest, if any, was acquired by the Northern Pacific Railroad Company in these lands by virtue of the act of July 2, 1864."

Then, after stating that the grant made by that act was in the nature of a "float," no right or title to any particular section becom-

ing "certain" until a definite location of the line of road, it was further said:

"If, therefore, the Perham map of 1865 were conceded, for the purpose of the present discussion, to have. been sufficient as a map of 'general route'—and nothing more can possibly be claimed for it—these lands could not be regarded as having been brought by that map (even if it had been accepted) within the grant to the Northern Pacific Railroad Company, and thereby have become so segregated from the public domain as to preclude the possibility of their being earned by other railroad companies under statutes enacted by Congress after the filing of that map and before any definite location by the company of its line."

An extended reference to decided cases, particularly to Northern Pacific R. R. Co. v. Sanders and Menotti v. Dillon, supra, was then made, in the course of which it was declared that a general statement in Buttz v. Northern Pacific R. R. Co., 119 U. S. 55, 72, 7 Sup. Ct. 100, 30 L. Ed. 330, to the effect that, upon the designation of the general route of the Northern Pacific Railroad, "the law withdraws" the odd-numbered sections within the prescribed limits for the protection of the grant, was too broad, if intended to convey the thought that the designation of such route would prevent these sections from being granted by Congress to, and from being earned by, another railroad corporation prior to the definite location of the line of road. It was then said:

"As the grant contained in the act of July 2, 1864, did not include any lands that had been reserved, sold,, granted, or otherwise appropriated at the time the line of the Northern Pacific Railroad was 'definitely fixed'; as the route of the Northern Pacific Railroad had not been definitely fixed at the time the act of July 25, 1866, was passed, or when the line of the Oregon Company was definitely located; as the lands in dispute are within the limits of the grant contained in the act of 1866; as the route of the Oregon Railroad was definitely fixed, at least when the map showing that route was accepted by the Secretary of the Interior on the 29th day of January, 1870, the Northern Pacific Railroad Company having done nothing prior to the latter date except to file the Perham map of 1865; and as prior to the forfeiture act of September 29, 1890, there had not been any definite location of the Northern Pacific Railroad opposite the lands in dispute—there is no escape from the conclusion that these lands were lawfully earned by the Oregon Company and were rightly patented to it."

In a later case, United States v. Northern Pacific R. R. Co., 193 U. S. 1, 7, 24 Sup. Ct. 330, 48 L. Ed. 593, the question was presented as to what effect had been and should be given to the Perham map, and therefore as to what was decided in the former case, and it was said:

"In United States v. Oregon & California R. R. Co., supra, it was held that, if the Perham map were valid as a map of general route, it did not operate as a reservation."

As no withdrawal was made by the officers of the Land Department along the route attempted to be designated by that map, and as the map did not of itself operate as a reservation, it follows that at the date of the grant of July 25, 1866, the lands in suit were not withdrawn or reserved for the benefit of the prior grant, but remained within the category of public land. The case chiefly relied upon is therefore clearly distinguishable from the present one. The ultimate question decided in that case, as is indicated by the ex-

tracts before quoted from the opinion, was whether the grant of July 2, 1864, of itself excluded the lands in suit from the grant of July 25, 1866. Of course it did not. It did not identify them as within the limits of the grant, and, there being no definite location of the line of road opposite to them, they were never so identified.

The decree is affirmed.