LUCINDA BRANDON *et al.* V. NEWTON L. ARD.

No. 14,673.    (87 Pac. 366.)

SYLLABUS BY THE COURT.

1. JUDGMENT—*Res Judicata.* A judgment against the United States in a suit to cancel a patent to a railroad company will not bar a homestead settler from pleading his homestead settlement as a defense in an action in ejectment brought against him by a grantee of the railroad company.

2. PUBLIC LANDS—*Grant—Reservation—Withdrawal from Settlement.* Where, in a grant of land to a railroad company, there is expressly reserved from its operation all lands to which the right of preemption or homestead settlement has attached when the line is definitely fixed, the land commissioner, in the absence of express direction by congress, and prior to the definite location of the line, has no authority to issue an order withdrawing from preemption or homestead settlement any of such lands, and such an order, if issued, is nugatory.

Error from Allen district court; TRAVIS MORRIS, judge *pro tem.* Opinion filed October 6, 1906. Affirmed.

STATEMENT.

THIS was an action for the possession of the north half of the northeast quarter of section 11, township 26, range 20, in Allen county, brought by Alexander Brandon against Newton Ard. Since the action was commenced Alexander Brandon died, and it has been revived in the name of his executors and heirs. The defendant recovered judgment and the plaintiffs bring the case here for review.

The plaintiffs claim title by a deed from the Missouri, Kansas & Texas Railway Company, which held by patent from the governor of Kansas, dated May 19, 1873, issued by virtue of a grant of land by the United States to the state of Kansas, dated March 3, 1863, to aid in the construction of railroads and telegraphs. The act provides that there shall be granted every alternate section of land, designated by odd numbers,

for ten sections in width on each side, in aid of the construction of the following roads, and each branch thereof: First, a railroad and telegraph line from the city of Leavenworth, Kan., by way of Lawrence and the Ohio City crossing of the Osage river to the southern line of the state, in the direction of Galveston bay, in Texas, with a branch from Lawrence, by the valley of the Wakarusa river, to a point on the Atchison, Topeka & Santa Fe railroad where that road intersects the Neosho river; second, a railroad from the city of Atchison, Kan., *via* Topeka, to the western line of the state, in the direction of Fort Union and Santa Fe, N. M., with a branch where the latter crosses the Neosho, down the Neosho valley to the point where the road first named (the Leavenworth road) enters the Neosho valley. This grant contains the following limitations:

"But in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section or any part thereof, granted as aforesaid, or that the right of preemption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the secretary of the interior to cause to be selected, for the purposes aforesaid, from the public lands of the United States nearest to tiers of sections above specified, so much land, in alternate sections or parts of sections, designated by odd numbers, as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated, or to which the rights of preemption or homestead settlements have attached as aforesaid; which lands, thus indicated by odd numbers and selected by direction of the secretary of the interior as aforesaid, shall be held by the state of Kansas for the use and purpose aforesaid; provided, that the land to be so selected shall in no case be located further than twenty miles from the lines of said road and branches; provided further, that the lands hereby granted for and on account of said roads and branches severally shall be exclusively applied in the construction of the same, and for no other purpose whatever, and shall be disposed of only as the work

progresses through the same, as in this act hereinafter provided." (12 U. S. Stat. at L. p. 772.)

The corporation known as the Atchison, Topeka & Santa Fe Railroad Company acquired the right to the lands designated under the second subdivision of this act, and all rights granted it by this act for the construction of its branch from a point at or near Fort Riley down the Neosho valley to where the Leavenworth road might enter the Neosho valley were assigned to and became vested in the Missouri, Kansas & Texas Railway Company on March 3, 1866, and this assignment was ratified by the legislature of Kansas February 26, 1867.

Following the passage of the federal act of 1863, and on March 19, 1863, the commissioner of the land-office, without being advised by the filing of a plat of general location of the road, and solely upon the request of the senators and representatives in congress from Kansas, transmitted to the register and receiver of the local land-office at Humboldt, Kan., a letter of withdrawal and a diagram showing the probable lines of the Leavenworth, Lawrence & Galveston railroad. The letter of withdrawal contains the following instruction:

"You will, therefore, understand from the foregoing:

"(1) That the odd sections within the limits of said railroads and branches are absolutely withdrawn from sale, preemption, or homestead entry, except so far as inceptive rights may have accrued prior to the receipt by you of this order."

The land in controversy is a portion of the lands described in the diagram. In 1867 the Leavenworth, Lawrence & Galveston road filed its map of definite location. It was then found that the land in question was outside its place limits but within its indemnity limits. The Missouri, Kansas & Texas railroad definitely located its line in December, 1866, and the land in controversy fell without its place limits but within its indemnity limits. The land was therefore outside

Brandon v. Ard.

the place limits but within the overlapping indemnity limits of both roads. This land was selected by the Missouri, Kansas & Texas railroad as indemnity lands, and was patented to it by the patent hereinbefore referred to, and was conveyed to Alexander Brandon by the railroad company. The west half of the southeast quarter of section 2, township 26, range 20, which adjoins the tract in controversy, was selected by the Leavenworth, Lawrence & Galveston railroad as indemnity lands, and was patented to it November 3, 1873. This company sold this land to Charles H. Pratt.

Ard claims title to both tracts under a homestead settlement made in June, 1866. He possessed all the necessary qualifications to homestead 160 acres of land of the public domain. In June, 1866, he settled and made substantial improvements on this land, for the purpose and with the intent of perfecting a title thereto as his homestead. On July 14, 1866, he prepared his homestead application in due form and the requisite affidavits, went to the local land-office at Humboldt with his witnesses, and presented his application and affidavits, and tendered the entry fee to the proper officers and requested that he be allowed to enter the two tracts as a homestead. His application was rejected by the officer in charge on the ground that the lands had been withdrawn from preemption and homestead entry by the instructions contained in the letter of the commissioner of the land-office of March 19, 1863. Mr. Ard returned to the land and has been in the actual occupancy thereof since his original entry, always claiming the right to enter it as a homestead. He subsequently made several applications to the local land-officers for permission to enter this land as a homestead, but each time was denied the right for the same reasons assigned on his first application, until December 21, 1896, when he was permitted to make homestead entry, upon which a patent was issued December 17, 1900.

In June, 1887, separate actions in ejectment were

commenced in the district court of Allen county by
Pratt and Brandon against Ard for the possession of
these lands, Pratt claiming the land in section 2 under
his purchase from the Leavenworth, Lawrence & Gal-
veston railroad and Brandon claiming the tract now in
controversy under his purchase from the Missouri,
Kansas & Texas railroad.  The causes were tried in the
district court and Ard was defeated.  He prosecuted
separate proceedings in error to this court, where both
judgments were affirmed.  (*Ard v. Pratt*, 43 Kan. 419,
23 Pac. 646; *Ard v. Brandon*, 43 Kan. 425, 23 Pac.
648.)  Ard appealed both cases to the supreme court
of the United States, where the judgments of the dis-
trict court, as well as the judgments of this court, were
set aside and the causes remanded for retrial.  (*Ard v.
Brandon*, 156 U. S. 537, 15 Sup. Ct. 406, 39 L. Ed. 524.)
Afterward, and while they were awaiting a retrial in
the district court of Allen county, the United States,
under an act of congress passed March 3, 1887, requir-
ing the immediate adjustment by the secretary of the
interior, in accordance with the decisions of the su-
preme court of the United States, of all unadjusted
land grants made by congress to aid in the construction
of railroads (24 U. S. Stat. at L. p. 556), commenced
an action in the United States circuit court for the dis-
trict of Kansas against the Missouri, Kansas & Texas
railroad and other railroad companies to cancel their
patents to certain even-numbered sections of land in
Allen county.  Subsequently the bill was amended and
certain odd-numbered sections within the indemnity
limits were included, and all parties holding such lands
under deed from the railroads appear to have been
made defendants.  By the amended bill the land in
question was included in the action and Alexander
Brandon was made a defendant.  In this action the
United States was unsuccessful and judgment was ren-
dered against it.  (*United States v. Missouri &c. Rail-
way*, 141 U. S. 358, 12 Sup. Ct. 13, 35 L. Ed. 766.)  Ard
was not a party to that action and was not represented,

unless it can be said, as claimed by the plaintiffs, that he was a party by representation—that is, that the United States was the representative of all persons claiming adversely to the Missouri, Kansas & Texas railroad.

*L. W. Keplinger,* for plaintiffs in error.

*Ewing, Gard & Gard,* for defendant in error.

The opinion of the court was delivered by

GREENE, J.: Plaintiffs contend: (1) That the judgment against the United States in the case of *United States v. Missouri &c. Railway,* decided in the circuit court of the United States and afterward taken to the supreme court (141 U. S. 358, 12 Sup. Ct. 13, 35 L. Ed. 766), was a full and complete judicial determination that Ard had acquired no equity in the real estate by his settlement and several attempts to homestead it, and that such judgment is a complete bar against his contentions in this action; (2) that the letter of the land commissioner of March 19, 1863, withdrawing all the odd-numbered sections for ten miles on each side of what he supposed would be the line of the Leavenworth, Lawrence & Galveston railroad was a segregation and setting apart of this land for this railroad company—a withdrawal from market of all odd-numbered sections indicated in the diagram— and that the lands thus withdrawn remained permanently exempt from preemption entry and homestead settlement.

We do not agree with the first contention. The action of the United States against the several railroad companies was not commenced, as suggested by plaintiffs, by the procurement of Ard. It was brought by the attorney-general of the United States at the request of the secretary of the interior, under the act of congress of March 3, 1887, authorizing and directing the secretary of the interior "to immediately adjust, in accordance with the decisions of the supreme court,

each of the railroad land grants made by congress to aid in the construction of railroads and heretofore unadjusted." (24 U. S. Stat. at L. p. 556.) Ard, by settling on this land and attempting to perfect a homestead title thereto, did not thereby become a ward of the government. He did not constitute the United States his trustee to litigate for him his equitable rights to the land upon which he had settled, nor did it become such trustee by operation of law. Ard was not made a party to the action. He had no control or supervision over any issue in the case. He was asking nothing at the hands of the court, and so far as anything appears to this court no person was asking anything against him.

The act did not authorize the secretary of the interior to institute proceedings in equity to settle controversies arising between individual claimants to these lands, nor to adjust disputes between the railroad companies and persons claiming adversely to them. The action was one to determine the right of the railroad companies to hold the legal title to these lands as against the United States. The questions involved were those arising exclusively between the United States on the one side and these corporations and persons claiming the legal title to the lands under them on the other side. Ard was not made a party because his equitable claim to the land, as against the railroad company or its grantee, was not involved and could not be determined. The United States was not interested in the litigation pending between Ard and Brandon involving their equitable rights to any particular tract of land. In *Ard v. Brandon,* 156 U. S. 537, 15 Sup. Ct. 406, 39 L. Ed. 524, it was urged that, under the authorities of the cases of *Kan. City, &c., R. R. Co. v. Attorney-general,* 118 U. S. 682, 7 Sup. Ct. 66, 30 L. Ed. 281, and *United States v. Missouri &c. Railway,* 141 U. S. 358, 12 Sup. Ct. 13, 35 L. Ed. 766, sustaining the regularity and validity of certain patents to the

Missouri, Kansas & Texas Railroad Company, an individual could not thereafter contest nor question the right of the company to any lands to which it held patent. In the opinion, referring to these cases, the court said:

"No adjudication against the government in a suit by it to set aside a patent estops an individual not a party thereto from thereafter setting up his equitable rights in the land for which the patent was issued." (Page 541.)

It is also contended that if it should be held that Ard was not a party by representation to the suit in *United States v. Missouri &c. Railway, supra,* and is not for that reason concluded, he should nevertheless, by reason of his presence and participation in that action, be held to be estopped by that judgment. We have no doubt of the correctness of the rule that one not a party to the record may, by his conduct in directing, managing and actually participating in the trial, be estopped by the judgment therein as to any question actually litigated and decided. However, the vital question in this case is the effect of the order of withdrawal, and we do not find that this question was tendered by the bill, nor litigated in the action, or determined by the judgment.

Plaintiffs' second contention—that the diagram and order of withdrawal of March 19, 1863, had the effect to segregate all the lands included in the diagram from the public domain and set it apart for the exclusive use of railroad companies—is not well founded, nor was such the understanding of the land department, as is conclusively shown by the order from that department to the local land-office of April 20, 1866, after the Leavenworth, Lawrence & Galveston railroad had filed its map of definite location, directing the withdrawal of certain lands for its benefit. In this letter the commissioner said:

"Also, where settlement may have been made on an odd-numbered section outside of the ten and within

the twenty-mile limits prior to the receipt by you of this order of withdrawal the settler will be protected in his rights by reason of such prior settlement."

Regardless of any interpretation subsequently placed upon the order of withdrawal of March 19, 1863, by the land commissioner, and regardless also of what such order contained, the grant itself reserved from its operation all of the public domain which had, prior to the definite location of any line of road, been sold by the United States or otherwise reserved, and all the lands to which, prior to such definite location, the right of preemption or homestead settlement had attached, and lands falling within any of these provisions when the line was definitely fixed were excluded from the granting clause of the act. Ard's homestead rights attached prior to the definite location of any line of railroad. He is therefore within the exact provision of one of the reservations in the grant. The pretended withdrawal, if given the effect contended for by plaintiffs, would be giving such commissioner power to nullify one of the important reservations in the grant. This precise question was before the supreme court in *Nelson v. Northern Pacific Railway*, 188 U. S. 108, 23 Sup. Ct. 302, 47 L. Ed. 406. The grant contained the following reservations:

"That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption, or

other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preempted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections." (13 U. S. Stat. at L. p. 367.)

An order of withdrawal dated November 1, 1873, was issued by the commissioner of the land-office, which included the land in controversy in that action. Subsequently, in 1881, and before the railroad company had definitely located its line, Nelson made a homestead settlement upon a portion of the land within the place limits as shown by the map of definite location. The contention was that the withdrawal order withdrew the land from preemption and homestead settlement. In the opinion the court said:

"But we have also seen, looking at the third section, which was the granting section of the act, that congress did not *grant* every odd-numbered alternate section within the general limits specified, but *only* the odd-numbered alternate sections to which the United States had full title, and which had *not* been previously reserved, sold, granted or otherwise appropriated, *and* which were *free* from preemption or 'other claims or rights' *at the time* the line of the road was *definitely fixed*—giving to the railroad company the right to select lands, within certain limits, in place of such as were found, *at the date of definite location,* to have been disposed of or to be '*occupied by homestead settlers.*'" (Page 116.)

It was held that the order of withdrawal did not withdraw the land from homestead settlement, and many cases were cited sustaining this conclusion. In the opinion the expressions used by Mr. Justice Field in *Buttz v. Northern Pacific Railroad,* 119 U. S. 55, 72, 7

28—74 KAN.

Sup. Ct. 100, 30 L. Ed. 330, relied upon by plaintiffs, to the effect that when the general route of that road was made known by a map duly filed and accepted "the *law* withdraws from sale or preemption the odd sections to the extent of forty miles on each side; the object of the law in this particular is plain; it is to preserve the land for the company to which, in aid of the construction of the road, it is granted," are quoted and commented on as follows:

"But it is evident, in view of both prior and subsequent decisions, that this language is not to be taken literally or apart from the other portions of the opinions of the eminent jurist who delivered the judgment of the court. If, upon the filing and acceptance of the map of *general* route, the *law* withdrew the odd-numbered sections, then the previous holding in many cases that until definite location the grant was a float, with no interest in specific sections being acquired by the railroad company, would be meaningless; and there would be some difficulty in congress appropriating such lands prior to definite location. Indeed, it is manifest that the court did not mean to announce any new doctrine in the Buttz case; for Mr. Justice Field, when delivering judgment in that case, said that the charter of the Northern Pacific Railroad Company contemplated 'the filing by the company, in the office of the commissioner of the general land-office, of a map showing the *definite location* of the line of its road, and *limits* the *grant* to *such* alternate odd sections as have not *at that time,* been reserved, sold, granted, or otherwise appropriated, and free from preemption, grant, or other claims or rights.' " (Page 120.)

Again, in the later case of *Sjoli v. Dreschel,* 199 U. S. 564, 26 Sup. Ct. 154, 50 L. Ed. 311, it was said:

"From the numerous cases in this court relating to the above act of July 2, 1864, the following propositions are to be deduced: . . . That no rights to lands within indemnity limits will attach in favor of the railroad company until after selections made by it with the approval of the secretary of the interior;

"That up to the time such approval is given, lands within indemnity limits, although embraced by the company's list of selections, are subject to be disposed

of by the United States or to be settled upon and occupied under the preemption and homestead laws of the United States; and,

"That the secretary of the interior has no authority to withdraw from sale or settlement lands that are within indemnity limits which have not been previously selected, with his approval, to supply deficiencies within the place limits of the company's road." (Page 565.)

A critical examination of the cases which are said to maintain a contrary rule will show that they were cases arising under grants which directly authorized a withdrawal, or between original and subsequent grantees claiming the same lands, and in the latter cases the question was what was to be understood by the term "public lands," as used in the subsequent grant—that is, whether it was exclusive of lands covered by a former grant not yet earned. It happened in many of the cases that the lands covered by the prior grant had been withdrawn by the secretary of the interior, but this was not the controlling feature of the decisions. The holdings generally have been that the term "public lands," as used in the subsequent grant, excluded lands included within prior grants.

The case of *Wolsey v. Chapman,* 101 U. S. 755, 25 L. Ed. 915, cited by plaintiffs, belongs to the first class. There the controversy arose over a general land grant made to the state of Iowa of 500,000 acres of land for internal improvements, dated September 4, 1841. These lands were to be selected from any public lands, "except such as is or may be reserved from sale by . . . proclamation of the president of the United States." (5 U. S. Stat. at L. p. 455.) April 6, 1850, the secretary of the interior directed that certain lands in the state of Iowa be reserved from sale in order to settle the rights of rival claimants thereto. On July 20, 1850, the agent of the state of Iowa having in charge the school-lands and school-fund gave notice at the general land-office that he had selected a portion of lands thus withdrawn as a part of the 500,000-

acre grant under the act of 1841. It was held that the order of withdrawal was authorized by the grant and all lands which had at the time been reserved and all that might thereafter be reserved by the proclamation of the president were excepted from the grant. It was also held that the order of withdrawal issued by the secretary of the interior must be held to have been by proclamation of the president and was the withdrawal provided for in the grant.

The case of *Northern Lumber Co. v. O'Brien,* 139 Fed. 614, 71 C. C. A. 598, also relied upon by plaintiffs, does not involve the question we are called upon to decide. It does, however, recognize the rule as here stated. In distinguishing the question presented to it from the one in *Nelson v. Northern Pacific Railway, supra,* and other similar cases, the court said:

"None of these cases has particular reference to or makes the decision turn upon the clause, 'there be, and hereby is, granted . . . every alternate section of public land,' which makes the grant one *in præsenti* of land then public, but instead each had particular reference to and makes the decision turn upon the limitation on the granting clause, which makes it also requisite that 'the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preemption, or other claims or rights at the time the line of said road is definitely fixed.' They all recognize the well-established rule, that the grantee under a railroad land grant acquires, by designating the general route of its road, only an inchoate right to the odd-numbered sections granted by congress, and that until the definite location of the road these sections remain within the disposing power of congress, and this, even though they be withdrawn for the protection of the grant, as in the present case." (Page 620.)

The well-established rule, therefore, is that where lands are granted to a railroad, with certain reservations, for purposes designated in the grant, in the absence of express authority the secretary of the interior or the land commissioner is powerless to make any order with reference thereto which will have the effect to de-

feat the reservations.  Congress has exclusive authority to dispose of the public domain, and in the absence of its adoption of any specific rule for carrying out its purpose the land department may adopt such rules and regulations as to it may seem proper for that purpose; but in the absence of express authority that department is powerless to adopt a procedure which will defeat the expressed intention of congress in the disposition of the public domain.  Congress, in the grant in question, expressly reserved from its operation all lands sold or reserved by the United States or to which the right of preemption or homestead settlement attached when the line of railroad or its branches should be definitely fixed.  The lands falling within these reservations were not granted to the railroad companies, and the land commissioner had no authority by any act to deprive those for whose benefit the reservations were made of the privilege of exercising that right.  The judgment is affirmed.

All the Justices concurring.